UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GUILLERMO MUNIVE                                        CIVIL ACTION

VERSUS                                                  NO: 06-11203

CHET MORRISON OFFSHORE, LLC,                            SECTION: "A" (2)
ET AL.

## ORDER AND REASONS

Before the Court are a **Motion for Summary Judgment (Rec. Doc. 19)** filed by defendant Chet Morrison, LLC, and a **Motion for Summary Judgment by Defendant, Greene's Energy Group, LLC and Third Party Defendant, Nautilus Insurance Company (Rec. Doc. 23)**. Both motions are opposed. The motions, set for hearing on February 6, 2008, are before the Court on the briefs without oral argument. For the reasons that follow, the **Motion for Summary Judgment (Rec. Doc. 19)** filed by Chet Morrison, LLC is **GRANTED** and the **Motion for Summary Judgment by Defendant, Greene's Energy Group, LLC and Third Party Defendant, Nautilus**

**Insurance Company (Rec. Doc. 23)** is **DENIED**.

I. **BACKGROUND**

The specific dispute at issue in the cross motions for summary judgment arises out of the Master Service Contract entered into between Chet Morrison Contractors and Greene's Pressure Testing and Rentals, Inc. ("Greene's Rentals") on September 20, 2000. The contract requires, inter alia, Greene's Rentals to defend and indemnify Chet Morrison in connection with claims arising out of services or materials provided pursuant to the contract.[1] The indemnification requirement is without regard to the negligence, strict liability, or fault of Chet Morrison or its employees. (Chet

---

[1] 3.0 INDEMNITIES

Notwithstanding anything elsewhere contained in this agreement, Sub-Contractor hereby agrees to *fully indemnify* and hold CMC, its employees, other sub-contractors, agents, affiliates, or subsidiaries companies, co-venturers, co-operators, partners, and customers, forever harmless, and to undertake to defend CMC and CMC's employees, other sub-contractors, agents, affiliates or subsidiary companies, co-venturers, co-operators, partners, and customers of and from *any and all liabilities, losses, damages, and costs, of whatsoever nature or kind*, including, but not limited to, claims for personal injury or death, claims for damage to property of third parties, claims for damage to property of CMC or its co-venturers, co-operators, partners, or customers, claims for death, loss of services, maintenance and cure, or wages, or any other claim or claims, *arising out of or in anyway* [sic] *directly or indirectly connected with the activities of Sub-Contractor or its sub-contractors in connection with the work performed or material to be furnished under this agreement* or the ownership, maintenance, management, operation, transportation of passengers, carrying of cargo, loading or unloading of cargo, loading or unloading of passengers, and navigation of any vessel or vessels; *and whether or not said claims are caused or contributed to by the negligence, strict liability, or fault of CMC or CMC's employees*, other sub-contractors, co-venturers, co-operators, partners, or customers, or of any person or party for whose acts CMC and CMC's co-venturers, co-operators, partners, and customers, is (are) or may be liable. *Sub-Contractor's liability under this section shall be limited to the greater of $5,000,000.00 or the actual amount of insurance required to be carried pursuant to the terms and provisions of this contract*.

(Chet Exh. A – Master Service Contract, § 3.0) (emphasis added).

2

Cross Claim ¶ VIII). The contract has a specific termination clause.[2] According to Chet Morrison, the September 20, 2000 Master Service Contract has never been terminated by either party pursuant to the terms in the termination clause.

On July 30, 2004, Greene's Energy Group, LLC ("GEG") entered into an Asset Purchase Agreement in which it purchased the assets of Greene's Rentals. Subsequently, on August 3, 2004, GEG forwarded a letter to Chet Morrison informing the latter that GEG purchased the assets of Greene's Rentals and from that point forward GEG would serve as the contracting party with Chet Morrison.[3] The parties disagree as to the implications and consequences of this letter.

---

[2] 1.0 AGREEMENT

1.4  This contract shall remain in effect until cancelled by either party by giving the other party ***ten (10) days written notice***; provided, however, that with respect to any work in progress as of the date of cancellation, this contract s hall continue in effect until the work is completed.

(Chet Exh. A – Master Service Contract, § 1.4) (emphasis added).

[3] The August 3, 2004 letter provides as follows:

We are pleased to announce the purchase of the assets of Greene's Energy Services, Inc. and its affiliated companies and d/b/a's including Greene's Pressure Testing & Rentals, Inc. ("GPTR") "Greene's Pipeline Services" ("GPS"), H. Rowe Greene, Jr. Leasing Company, L.L.C. ***We take this opportunity to renew our commitment to you, our valued customer, to continue the scope and magnitude of services we have provided in the past.*** We are optimistic that your company will benefit from the new services that will be added to our portfolio in future months.

Although ***many of our current staff members will remain familiar to you***, we are pleased to note that we have formed a ***new management team*** consisting of seasoned personnel affiliated with our new ownership group ***as well as other members who you will recognize as experienced industry leaders***. Over the next few months, we will be introducing these individuals as we meet with you and learn more about your company's needs as well as provide our valuable recommendations regarding how we can creatively meet these needs.

Commensurate with this transaction, we have formed Greene's Energy Group, LLC ("GEG"), a Texas limited liability company. Going forward, ***GEG will serve as the contracting party with your company***. The ***new federal taxpayer identification number*** for GEG is referenced above to forward on to your accounting document. ***In connection with this amendment, we would ask that you note your acceptance below where indicated. Please then return one copy of this letter to our Contracts***

3

In October 2006, Chet Morrison leased a 6X6 peerless jet pump from GEG to use in burying a pipeline. This matter arises out of the use of that pump on or about October 29, 2006. Plaintiff, Guillermo Munive, an employee of Chet Morrison, alleges he was injured while trying to prime the pump. As a result of this accident, Plaintiff filed suit against Chet Morrison and GEG, asserting claims of Jones Act negligence and unseaworthiness against Chet Morrison. Chet Morrison made demands for defense and indemnity pursuant to the terms of the Master Service Contract, which tender was not accepted. (Chet Cross Claim ¶ IX; Chet Mem. in Supp. p. 3). Consequently, Chet Morrison filed a Cross-Claim and Third-Party Claim against GEG and its various underwriters. (Rec. Doc. 9).

Chet Morrison moves for summary judgment on its claim for contractual defense and indemnity against GEG. According to Chet Morrison, the language in the Master Service Contract clearly provides that Chet Morrison is to be indemnified, regardless of whether the claim is "caused or contributed to by the negligence, strict liability, or fault" of Chet Morrison. (Chet Mem. in Supp. p. 5). In addition, according to Chet Morrison, any argument that the Master Service Contract was rendered void after Greene's Rentals sold its assets to GEG is without merit. (*Id.*)

Concomitantly, GEG moves for summary judgment pertaining to the contractual claims asserted by defendant/cross claimant/third party defendant, Chet Morrison. (GEG Motion p. 1). According to GEG, on the date of Plaintiff's accident, there was no written contract or agreement in existence or effect between Chet Morrison and GEG that required GEG to defend and/or

---

*Administrator as follows:*. . .

(Chet Exh. F; GEG Exh. 4 – letter dated August 3, 2004) (emphasis added).

indemnify Chet Morrison.

## II.   DISCUSSION

As an initial matter, the Court notes that the Master Service Contract does not contain a choice of law provision.  (*See* Chet Mem. in Supp. p. 4).  Chet Morrison submits that the outcome is the same under either maritime law or Louisiana law.  (*Id.* at n. 1).  GEG cites only Louisiana law in its Memorandum in Support of Motion for Summary Judgment by Defendant, Greene's Energy Group, LLC and Third Party Defendant, Nautilus Insurance Company and in Opposition to Motion for Summary Judgment by Defendant, Chet Morrison, LLC (Rec. Doc. 23).  Because neither party briefed the Court as to any potential difference in result, the Court will apply Louisiana law.

The parties do not dispute that the language in the indemnity provision encompasses a situation such as the one involved in this case.  Rather, the sole issue in these cross motions is whether a written contract or agreement existed between the parties on the date of Plaintiff's accident that required GEG to defend or indemnify Chet Morrison.

### A.   *The Parties' Contentions*

#### 1.   *Chet Morrison*

According to Chet Morrison, the Master Service Contract applies in this matter, thereby entitling Chet Morrison to a defense and indemnity from Greene's Rentals.  As support, Chet Morrison argues that the contract was never cancelled by either party pursuant to the terms of the termination clause.  In addition, Chet Morrison asserts that GEG is the corporate successor to Greene's Rentals and assumed the obligations under the September 20, 2000 Master Service

Contract.

As support, Chet Morrison cites the letter from GEG to Chet Morrison dated August 3, 2004, advising of the sale and requesting that Chet Morrison acknowledge the new entity. (*Id.* at p. 6). Chet Morrison contends that the correspondence "does not in any way terminate or cancel the September 20, 2000 Master Service Contract." (*Id.*) As support, Chet Morrison references the following language: "We take this opportunity to renew our commitment to you, our valued customer to continue the scope and magnitude of services we have provided in the past." (*Id.*) (quoting Chet Exh. F; GEG Exh. 4).

### *2.     Greene's Energy Group*

It is GEG's position that it did not assume the liabilities of Greene's Rentals, nor did it assume any contracts then in existence between Greene's Rentals and its customers. GEG contends that the Master Service Contract was not in effect between Chet Morrison and GEG. Specifically, GEG emphasizes Chet Morrison's failure to sign and return the August 3, 2004 letter to GEG. (GEG Mem. in Supp. p. 2). As a result of this failure, GEG alleges that GEG continued to do business with Chet Morrison on a call-out basis with the assumption that no Master Service Contract existed between GEG and Chet Morrison. (*Id.* at p. 3) (citing GEG Exh. 5, Affidavit of Robert P. Viylus). As further support, GEG notes that the contract defines "Sub-Contractor" as "Green's Pressure Testing and Rentals, Inc. and all affiliates." (GEG Mem. in Supp. p. 3). GEG finds of paramount importance the fact that the language does not state "all successors and assigns." (*Id.*)

### *B.     Law and Analysis*

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 248). The Court must draw all justifiable inferences in favor of the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 255). Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," *Celotex Corp. v. Catrett*, 477 U/S/ 317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Id.* (Citing Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

### 1. *Successor Liability*

Under Louisiana law:

> [A] newly organized corporation is liable for the debts of an old one ... where it is shown that the succession was the result of a transaction entered into in fraud of the creditors of the old corporation *or* that the circumstances attending the creation of the new ... were of such a character as to warrant the finding that the new, is merely a continuation of the old corporation.

*Hollowell v. Orleans Regional Hospital LLC*, 217 F.3d 379, 390 (5th Cir. 2000) (citing *Wolff v.*

7

*Shreveport Gas, Elec. Light & Power Co.*, 138 La. 743, 70 So. 789, 794 (1916); *Industrial Equip. Sales & Serv. Co. v. Sec. Plumbing Inc.*, 666 So.2d 1165, 1166-67 (La. Ct. App. 1995); *Russell v. SunAmerica Secs., Inc.*, 962 F.2d 1169, 1175-76 (5th Cir. 1992)) (emphasis in original).

Regarding liability in connection with an asset transfer,

> [W]hen a corporation sells all of its assets to another, the latter is not responsible for the seller's debts or liabilities, except where (1) the purchaser expressly or impliedly agrees to assume the obligations; (2) the purchaser is merely a continuation of the selling corporation; or (3) the transaction is entered into to escape liability.

*Allstate Ins. Co. v. Wal-Mart*, No. 98-1923, 2000 WL 388844, *3 (April 13, 2000) (quoting *Golden State Bottling Co. v. National Labor Relations Board*, 414 U.S. 168, 182 n. 5, 94 S.Ct. 414, 424 n. 5 (1973)). It is Chet Morrison's position that GEG is "simply the continuation of Greene's Rentals." (Chet Mem. in Supp. p. 7).

The Fifth Circuit recognizes eight factors typically taken into account in determining if the successor corporation is a "mere continuation" of the predecessor:

(1) Retention of the same employees;
(2) Retention of the same supervisory personnel;
(3) Retention of the same production facility in the same physical location;
(4) Production of the same product;
(5) Retention of the same name;
(6) Continuity of assets;
(7) Continuity of general business operations; and
(8) Whether the successor holds itself out as the continuation of the previous enterprise.

*Hollowell*, 217 F.3d at 391 (citing *Russell*, 962 F.2d at 1176 n. 2).

In this case, the factors weigh in favor of finding GEG to be a "mere continuation" of Greene's Rentals. Chet Morrison submitted evidence establishing that GEG retained previous

employees and supervisory personnel, thereby satisfying factors one and two. Specifically, Chet Morrison cites the depositions of the following employees whose positions remained the same after the "name change": Shawn Ellis (operations manager), Mark Anderson (shop foreman), and Melvin Cotton (dispatcher). (Chet Mem. in Supp. p. 8) (citing Chet Exh. D at p. 6; Exh. G at p. 25-26; Exh. H at p. 62). In addition, Chet Morrison asserts that Gene Garber, vice president of Greene's Rentals, the party who actually signed the Master Service Contract in September 2000, is a vice president at GEG. (*Id.*) (citing Exh. D at p. 94-95).

Moreover, GEG operates its business in the same facilities in the same locations. (Chet Mem. in Opp. p. 2). Regarding factor 5, although GEG did not retain the name "Greene's Pressure Testing and Rentals, Inc," the Court finds that the name "Greene's Energy Group" is sufficiently similar to create a sense of continuity in the eyes of the consumer. Furthermore, the business of Greene's Rentals remained the same. For example, employee Melvin Cotton agreed that GEG did the same business, rented the same equipment, did the same type of jobs**,** and called on the same customers. (Chet Exh. G, p. 27-28). In addition, Chet Morrison submitted an invoice from GEG, on which the name "Greene's Rentals" still appears.[4] (Chet Mem. in Supp. p. 7) (citing Chet Exh. I; Exh. D at p. 74).

Finally, Chet Morrison submits that GEG held itself out as a continuance of the previous enterprise. (*Id.* at p. 3). In support, Chet Morrison references the August 3, 2004 letter which expressly states: "[w]e take this opportunity to renew our commitment to you, our valued customer,

---

[4]The bottom of the invoice reads as follows: "Customers will be responsible for equipment while out of possession of Greene's Pressure Testing & Rentals, Inc." The Court notes that the top of the invoice bears the logo of GEG. (Chet Exh. I, Invoice dated December 2006).

9

to continue the scope and magnitude of the services we have provided in the past." (Chet Exh. F; GEG Exh. 4)

GEG does not address these factors. Rather, in discussing successor liability, GEG cites two cases to support its position that the asset purchase agreement insulated the purchaser from the seller's liability: *Joyner v. Ensco Offshore Oil Company*, No. 99-3754, 2000 WL 1586404 (E.D. La. Oct. 20, 2000); *Maltese v. Sunbeam-Oster Co., Inc.*, No. 92-3573, 1993 WL 386300 (Sept. 17, 1993). For instance, in *Joyner*, after an "*in camera* review of the Asset Purchase Agreement [the Court] found that the APA expressly insulates [Purchaser] from liability." *Joyner*, 2000 WL 1586404, *3. Similarly, in *Maltese*, the asset purchase agreement "specifically provides that [Seller] retains all of the liabilities . . . prior to the agreement's closing date." *Maltese*, 1993 WL 386300, *1. As such, GEG argues that the Asset Purchase Agreement between Greene's Energy Service, Inc., H. Rowe Greene, Jr. Leasing Company, L.L.C., Greene's Pressure Testing Company of Lafayette, La. and each of the equity owners thereof, and Greene's Oilfield, L.L.C. (later GEG) on July 30, 2004, also "insulates GEG from the liabilities of the selling companies." (GEG Mem. in Supp. p. 5-6).

In support, GEG cites Section 1.1 of the Asset Purchase Agreement, entitled Transfer of Assets[5], which explains that Seller transfers "all of the contracts ("the Assumed Contracts"). . ." to

---

[5]Section 1.1 Transfer of Assets

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller hereby sells, transfers, assigns, conveys and delivers unto the Purchaser and its successors and assigns all of its right[s] [sic], title and interest and to all of the tangible and intangible assets of the Seller, including without limitation, all of the assets listed on Schedule 1.1, ***all of the contracts ("the Assumed Contracts")***, all of Seller's good will, all third party accounts and notes receivable, all inventories and supplies, all machinery and equipment, all vehicles, all real property, including but

10

Purchaser. Schedule 1.1 lists only the following contracts as "Specified Assumed Contracts": (1) Employment Contract for Clifton J. Giroir, Jr. and (2) Lease Agreements. (GEG Exh. 3, Asset Purchase Agreement). In addition, GEG cites Section 1.3, entitled "No liabilities assumed."[6] Pursuant to this provision, GEG did "not assume or be[come] responsible for any claims against or liabilities . . . contracts, agreements . . . whatsoever of the Seller . . . except for the Assumed Liabilities." (*Id.* at § 1.3). Through his affidavit, the CEO of GEG, Robert P. Vilyus, declares "[t]hat as part of the Asset Purchase Agreement GEG did not assume the Master Service Contract in existence between Greene's Pressure Testing and Rentals, Inc. and Chet Morrison Contractors, Inc." (GEG Exh. 5, ¶ VI).

However, these arguments only establish that the first exception to the successor liability rule – the purchaser expressly or impliedly agrees to assume the obligation – is not applicable in this case. GEG does not argue that the "mere continuation" exception does not apply. The Court finds that the factors weigh heavily in finding GEG to be a "mere continuation" of Greene's Rentals and,

---

not limited to the real property described in Schedule 1.1 (the "Acquired Real Property"), and including Seller's title policies paid by Seller for the Acquired Real Property, all other items of prepaid nature, all current assets, and all intellectual property (collectively the "Acquired Assets").

(GEG Exh. 3 – Asset Purchase Agreement § 1.1) (bold emphasis added).

[6] Section 1.3 No liabilities assumed

The Purchaser ***shall not assume or be responsible for any claims against or liabilities, commitments, contracts, agreements or obligations whatsoever of the Seller***, and the seller will at all times indemnify and hold the Purchaser harmless from and against any claim therefor or liability arising therefrom, pursuant to the terms of Article V, ***except for the Assumed Liabilities***, as to which Seller shall owe Purchaser no obligation to either indemnify or to hold harmless. . . . Notwithstanding the foregoing, the Purchaser shall assume and be responsible for all obligations arising solely after the date hereof under the Assumed Contracts and certain third party liens and related obligations, as listed on Schedule 1.3(a) (the "Assumed Liabilities"). . . .

(*Id.* at § 1.3).

11

consequently, obligated for Greene's Rentals' liabilities.

### *2.     Consequences of the August 3, 2004 letter*

The Court's conclusion that GEG stepped into the shoes of Greene's Rentals is reinforced by the relationship between the parties after the Asset Purchase Agreement.

It is GEG's position that the Master Service Contract only included the affiliates of Greene's Pressure Testing and Rentals, Inc., not its successors and assigns; consequently, it is an "Unassigned Contract" per the Asset Purchase Agreement. (GEG Mem in Supp. p. 8). Pursuant to the terms of Section 1.11 of the Asset Purchase Agreement,[7] GEG required the consent[8] of Chet Morrison to be bound by the terms of the Master Service Contract. (*Id.*) Specifically, § 1.11 expressly states:

> The Seller is not assigning to the Purchaser any Assumed Contract or other right which by its terms requires the consent of any other party unless such consent has been obtained prior to the Closing (each an "<u>Unassigned Contract</u>"). After the Closing, the Seller shall cooperate fully with the Purchaser, at Purchaser's sole expense, in obtaining the ***consent*** of all required parties to the assignment of any Unassigned Contract.

---

[7]Section 1.11 <u>Condition to Transfer of Contracts</u>.

Notwithstanding anything herein to the contrary, at Closing the Seller is ***assigning to the Purchaser all of the Seller's rights in every Assumed Contract***, including, but not limited to, all of the Seller's rights under any Assumed Contract which, by its terms, allows the ***assignment thereof without the consent of the other party. The Seller is not assigning to the Purchaser any Assumed Contract or other right which by its terms requires the consent of any other party unless such consent has been obtained prior to the Closing (each an "<u>Unassigned Contract</u>").*** After the Closing, the Seller shall cooperate fully with the Purchaser, at Purchaser's sole expense, in obtaining the consent of all required parties to the assignment of any Unassigned Contract. ***The Purchaser shall be entitled to all benefits, and subject to all liabilities, of every Unassigned Contract accruing after the Closing***. The Seller shall be entitled to indemnification from Purchaser for any liabilities incurred by the Seller in connection with the foregoing, as set forth in further detail in <u>Section 5.3</u> hereto. ***Seller shall not take any affirmative action to terminate the Unassigned Contracts***.

(*Id.* at § 1.11) (bold emphasis added).

[8]The Court notes that according to the terms of § 1.11, the consent need not be written. Rather, the provision merely requires the "consent of all required parties to the assignment."

12

(GEG Exh. 3 – Asset Purchase Agreement § 1.11) (bold emphasis added).

In this vein, on August 3, 2004, GEG sent a letter to Chet Morrison explaining that it had purchased the assets of Greene's Energy Services, Inc. and its affiliated companies. (Chet Exh. F; GEG Exh. 4). The final paragraph of that letter reads as follows:

> Commensurate with this transaction, we have formed Greene's Energy Group, LLC ("GEG"), a Texas limited liability company. Going forward, GEG will serve as the contracting party with your company. The new federal taxpayer identification number for GEG is referenced above to forward on to your accounting department. In connection with this amendment, we would ask that you ***note your acceptance*** below where indicated. Please then return one copy of this letter to our Contracts Administrator . . . .

(*Id.*) (emphasis added).

It is undisputed that Chet Morrison did not sign the letter and acknowledge in writing its acceptance of GEG as the new contracting party. However, the evidence establishes that Chet Morrison and GEG had a continual ongoing and growing business relationship. The continued relationship clearly conveyed Chet Morrison's acceptance of GEG as the new contracting party.

According to Mr. Vilyus, "for those Greene's Pressure Testing and Rentals, Inc. customers who did not return the letter of August 3, 2004, signed, GEG continued to do business with them on a call out basis with the assumption that no Master Service Contract existed between GEG and the customer." (GEG Exh. 5, ¶ IX).

However, the affidavit of Joan Toups, employee of Chet Morrison, persuades the Court that GEG and Chet Morrison did not do business on a "call out basis." Instead, Chet Morrison's business with GEG continued to grow each year. Specifically, the Court notes the affidavit of Joan Toups, which asserts that Chet Morrison paid the following amounts to Greene's Rentals and GEG

13

in connection with invoices received:

  2003 $29,085.00
  2004 $10,474.17
  2005 $192,093.73
  2006 $463,268.86
  2007 $1,003,720.43
  2008 $48,483.17

(Chet Exh. J, Affidavit of Joan Toups).

In addition, GEG continued to send Chet Morrison certificates of insurance naming Chet Morrison as an additional insured under its policies, even after August 2004. (*Id.*) (citing Chet Exh. K, *in globo*). For example, the Certificate of Liability Insurance dated August 25, 2005 lists Chet Morrison Contractors as the Certificate Holder. (Chet. Exh. A, p. 9). Chet Morrison contends that "[this act] evidences [GEG's] belief that the terms of the September 20, 2000 Master Service Contract continued in effect." (*Id.*) This Court agrees. Finally, Chet Morrison asserts that it "reasonably relied on the action of sending the Certificate of Insurance as evidence that the contract remained in place." (*Id.*)

The Court finds that Chet Morrison tacitly accepted GEG as the new contracting party. Louisiana law explains the concept of acceptance by silence as follows: "[w]hen, because of special circumstances, the offeree's silence leads the offeror reasonably to believe that a contract has been formed, the offer is deemed accepted." La. Civ. Code art. 1942. Due to the growing business relationship and the continued certificates of insurance, it is unreasonable for GEG to claim that Chet Morrison did not accept the amendment. GEG cannot benefit from its continued and prosperous relationship with Chet Morrison in the years following its purchase of Greene's Rentals' assets and now claim that the contract did not exist. GEG stepped into the shoes of Greene's Rentals

14

and must accept the liabilities along with the benefits of this relationship.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 19)** filed by Chet Morrison, LLC is **GRANTED** and the **Motion for Summary Judgment by Defendant, Greene's Energy Group, LLC and Third Party Defendant, Nautilus Insurance Company (Rec. Doc. 23)** is **DENIED**.

February 22, 2008

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE